# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,        :

                               :      ID No. 1502002252

        v.                   :

                               :

QUENTIN JONES,            :

                               :

       Petitioner/Defendant.     :

Submitted: November 8, 2019
Decided: December 11, 2019

*Upon Defendant's Motion for Postconviction Relief*

**GRANTED**

## MEMORANDUM OPINION

Natalie S. Woloshin, Esquire, Woloshin, Lynch & Associates, P.A., 3200 Concord Pike, Wilmington, DE 19803; Attorney for Defendant.

Kathryn J. Garrison, Esquire, Department of Justice, 114 East Market Street, Georgetown, DE 19947; Attorney for the State

**KARSNITZ, J.**

"...we must never forget that the highest appreciation is not to utter words, but to live by them."

John F. Kennedy

President Kennedy wrote what I have quoted for a speech to be given at Thanksgiving in 1963. He never delivered the speech. In my far less articulate words, one should judge people for what they do and not what they say.

This is a Superior Court Criminal Rule 61 ("Rule 61") application for postconviction relief. The petitioner, Quentin Jones, ("Q. Jones")[1] was convicted of serious crimes, including two counts of rape in the first degree involving a child less than 12 years old. Trial was held in February, 2016 and Dwayne Jones ("D. Jones"), a prison informant, was an important witness presented by the State of Delaware ("the State"). Q. Jones was sentenced to life in prison in April of 2016.

At the time of Q. Jones' trial, D. Jones was in prison serving a three year sentence pursuant to 11 *Del. C.* §4204K ("K time") after pleading guilty in the summer of 2015 to three charges, which included two Class A misdemeanors and one Class F felony. D. Jones apparently was surprised by the amount of Level 5 time to which he was sentenced, as well as the "K time" requirement. Shortly

---

[1] This case involves at least three people with the surname Jones. I will identify them using their first initial to prevent confusion. Detective Jones I will identify as such. I mean no familiarity or disrespect.

after being sentenced, D. Jones began a persistent campaign to have his Level 5 time reduced. His efforts proved fruitless until he decided to provide testimony which helped convict Q. Jones. Within six months of Q. Jones' sentencing, D. Jones had his sentence substantially modified in his favor.

At Q. Jones' trial, D. Jones was questioned if he had an agreement with the State to receive any benefit for his testimony. He denied any agreement.

The parties have conceded that, if D. Jones had an agreement with the State, it would constitute *Brady* material and would have to be disclosed to Q. Jones and his defense team. The obvious reason is that an agreement between the State and D. Jones in exchange for his testimony would be grounds to impeach D. Jones. To put it simply, the defense for Q. Jones could assert that D. Jones' testimony was the result of the promises made to him, and not the truth.

Rule 61 proceedings always are serious and important. They are defendant's last chance. The road to success in a Rule 61 proceeding is difficult, as it should be. Jury verdicts are sacrosanct and are disturbed only for the most substantial and serious reason. But where the trial lacks fundamental fairness, and where the basic rights and rules are not followed, a jury verdict cannot stand. In my opinion, this is one of those cases.

As much as the State argues otherwise, I find that the State had an understanding with D. Jones that it would give its approval to D. Jones' effort to reduce his sentence in exchange for his testimony. Under the most basic requirements of *Brady,* that had to be disclosed to Q. Jones' defense team. Because it was not disclosed, Q. Jones' trial was fundamentally unfair, and I am granting his motion.

My action here is with reluctance, and I recognize the consequences to all, including the witness, and especially, the victim. Our process must be fair and meet established standards, which cannot be compromised to allow the State the benefit of an unsullied witness, while at the same time giving D. Jones the benefit of an unstated or implied bargain.

## Q. JONES' INITIAL RULE 61 PETITION

The State concedes that Q. Jones' petition was timely filed under Rule 61. Q. Jones, representing himself, filed the initial Rule 61 petition. Q. Jones raised six grounds in support of his claim for Rule 61 relief, which alleged deficiencies in trial counsel's performance. I give little attention to each of those grounds as none meet the *Strickland*[2] standard. *Strickland*, and its Delaware

---

[2]*Strickland v. Washington*, 466 U.S. 668 (1984).

4

counterpart, *Albury v. State*,[3] require counsel's performance to fall below an objective standard of reasonableness, and the moving party also must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. I have examined the record and the arguments of Q. Jones and counsel and find that neither prong of *Strickland* has been met. I reject all of the claims contained in the initial, *pro se* petition related to counsel's performance.

Additionally, Q. Jones made four claims related to the State's conduct in his trial. In his *pro se* Motion for Postconviction Relief, Jones claims: (1) the prosecution violated his Fifth and Sixth Amendment rights and 11 *Del. C.* §3507 by asking the victim leading questions without laying the proper foundation; (2) the trial judge erred in failing to *voir dire* juror 12, who had taken part in a Zumba class with the State's liaison; (3) he was prejudiced by Detective Jeremy Jones' testimony that he investigates crimes and "rapes such as this;" and (4) the trial judge failed to instruct the jury that informants are not presumed to be credible witnesses.

The State raises the procedural bars provided in Rule 61(1)(3) and (4) in response to these claims. All of the claims raised in this portion of Q. Jones'

---

[3] 551 A.2d 53 (Del. 1988).

5

petition were claims either raised at trial and rejected, or waived. I agree with the State's position that the four claims listed are barred by Rule 61(i)(3) and 61(i)(4).

## THE AMENDED RULE 61 PETITION

After Q. Jones filed his petition, counsel was appointed to review and supplement it. Counsel filed an Amended Motion for Postconviction Relief which raised one issue. In the amended motion, Q. Jones asserted his constitutional rights were violated because the State committed a *Brady*[4] violation by failing to disclose what he called a "tacit agreement" between the State and D. Jones in exchange for his testimony.

The State also raises the provisions of Rule 61(i)(3) as a bar to this claim. Rule 61(i)(3) reads in full:

> (3) Procedural default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows
> > (A) Cause for relief from the procedural default and
> > (B) Prejudice from violation of the movant's rights.

To me, the State's reasoning is both circular and disconcerting. At trial, the State represented to the Court, and D. Jones testified, there was no agreement with the

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

6

State. As a result, Q. Jones was foreclosed from making an argument of bias on the part of D. Jones to the jury. After the trial, the State now admits that D. Jones received the benefit of the bargain. However, according to the State, Q. Jones did not assert the bias issue "...in the proceedings leading to the judgment of conviction..." based upon facts which occurred *after* his trial. How one could assert a position in a trial leading to a conviction based upon events that occur thereafter is recondite. In any event, I do not find the bar of Rule 61(i)(3) applicable here. Even if it were, I also would find that under the facts of this case there is both cause for relief from the procedural default and substantial and overwhelming prejudice to Q. Jones from the violation of his rights. The facts as developed, and which arose after trial, prove the agreement between D. Jones and the State. The prejudice is the presentation by the State of important corroborating testimony with no ability by the defense to show it was bought and paid for.

## D. JONES' SUCCESSFUL
## EFFORT TO REDUCE HIS SENTENCE

I pause here to tell the saga of D. Jones' effort to obtain a reduced sentence. These facts show to me the reason for the result D. Jones eventually achieved and why what happened shows, as Q. Jones describes it, a "tacit agreement" between D. Jones and the State. The facts also show the persistence

7

and admirable zealous advocacy of D. Jones' attorney, Stephen W. Welsh, Esquire.

As I wrote earlier in this opinion, D. Jones was convicted of two misdemeanors and a Class F felony. Mr. Welsh testified at the hearing I held on Q. Jones' motion on November 8, 2019. His testimony was sincere and credible. He told me that D. Jones was unpleasantly surprised by his sentence, which included three years Level 5 "K time". Like many criminal defendants, D. Jones had family and obligations that he wanted to attend to as soon as he could. It is impossible for me to make a judgment whether D. Jones' sentencing expectations were reasonable but I have no doubt his expectations were diminished. D. Jones' conduct following his sentencing and Mr. Welsh's testimony demonstrates that to me.

D. Jones pled guilty to Assault in the Third Degree, Terroristic Threatening and Aggravated Menacing on March 6, 2015. A presentence investigation was ordered, and he was sentenced on April 24, 2015. He filed a *pro se* motion for modification of his sentence pursuant to Superior Court Criminal Rule 35 on July 13, 2015, and his counsel, Mr. Welsh, filed a similar motion on July 21, 2015. The Superior Court denied both motions by letter order dated July 23, 2015, two days after the motion was filed by Mr. Welsh. I am not in any way

being critical of the Court's July 23, 2015 order when I observe that it gave short shrift to D. Jones request.[5] D. Jones appealed the denial to the Delaware Supreme Court, which affirmed the denial on February 11, 2016. Coincidentally, the affirmance occurred during the Q. Jones trial.

D. Jones tried again and filed a Rule 35 Motion for Modification on November 12, 2015. The Superior Court promptly denied this motion as his appeal from the initial denials was pending before the Supreme Court.

Q. Jones was tried and convicted the second week of February, 2016. D. Jones was a reluctant witness at Q. Jones' trial. He met with the State prosecutor, Graham Robinson, Esquire during the trial and, according to Mr. Robinson, attempted to negotiate an agreement for a lesser sentence in exchange for his testimony. Mr. Robinson testified at D. Jones' Rule 61 hearing, and told me he refused to agree to D. Jones' demands because he thought it would impair D. Jones' credibility as a witness. Mr. Robinson told D. Jones he should testify because it was the right thing to do. At Q. Jones' trial, D. Jones testified about Q. Jones "jailhouse confession". Mr. Robinson testified that D. Jones' testimony was crucial to securing the conviction of Q. Jones. Mr. Robinson also supplied

---

[5]Rule 35 has a 90-day limitation period, and D. Jones' first motion was within that time. Any motion outside the 90 days can only be granted upon a showing of extraordinary circumstances. See *State v. Culp*, 152 A.3d 141 (Del. 2016).

contemporaneous notes of his conversations with D. Jones and the impact of his testimony on the Q. Jones trial.

Both Mr. Welsh and Mr. Robinson testified that after the Q. Jones trial Mr. Welsh approached Mr. Robinson to seek his help in modifying D. Jones' sentence. Both counsel also told me that Mr. Robinson said any such considerations would have to wait until Q. Jones was sentenced. I find this curious, because it supports the contention that the State did not want any appearance that it had an agreement with D. Jones until after a time when Q. Jones may have had an ability to question the relationship between the State and D. Jones. Q. Jones was sentenced on April 16, 2016.

On May 19, 2016 D. Jones filed his fourth Rule 35 motion to modify his sentence. In the May 19 motion, D. Jones added a claim that he had provided testimony in the Q. Jones case as a basis to give him relief. D. Jones' motion was denied in a short *pro forma* letter on June 7, 2016. D. Jones' case then took an interesting turn that ultimately would prove fruitful to him.

On June 7, 2016, D. Jones, through Mr. Welsh, filed his fifth Rule 35 motion for modification of his sentence. One should keep in mind that a Rule 35 motion beyond the 90-day time limit must be supported by extraordinary circumstances. Our Supreme Court has unequivocally determined that good

10

conduct in prison does not constitute extraordinary circumstance.[5] One could argue that Culp's good conduct by participating in prison educational and rehabilative programs is different than D. Jones' conduct in helping to convict a defendant charged with pedophila. I do not accept that premise. I am in accord with the reviewing Judge who wrote in connection with D. Jones' last petition, which included the ground of giving testimony against Q. Jones, that the testimony would not constitute extraordinary circumstances.

In any event, D. Jones' fifth Rule 35 motion, which did recite his testimony as a ground, resulted in different action than his previous four. The Superior Court responded with a letter which recited that the motion was "*deja vu all over again*", and also recited the repetitive nature of the motion, the prior appeal of a similar motion which resulted in an affirmance of the denial, and the lack of extraordinary circumstances. The Court concluded by saying that unless the State joined in the motion, it would be denied effective June 17, 2016.

The record reflects no action thereafter until September 27, 2016. On that day a different deputy attorney general, Rebecca Anderson, Esquire, wrote to the Court and stated that D. Jones had given assistance in the Q. Jones case, but Ms. Anderson made no recommendation concerning modification of D. Jones

---

[5]*State v. Culp, supra.*

11

sentence. Graham Robinson testified that he left his position as deputy attorney general in May, 2016 and Ms. Anderson took over his case load.

Mr. Robinson also testified that in April and May of 2016, and at the urging of Mr. Welsh, he looked at D. Jones' case and criminal history. He also spoke to the person who prosecuted the D. Jones case. Mr. Robinson was concerned by what he learned, specifically about the seriousness of D. Jones' crimes, and the extent of his criminal history. Robinson's concerns tempered his view and enthusiasm for supporting D. Jones' application. I find it likely the same concerns produced the equivocal letter from Ms. Anderson.

Ms. Anderson's letter in the Court file contained several handwritten notes of the sentencing Judge. One of the notes read: "So what exactly is the State's position as to what the defendant is seeking?" Court staff electronically forwarded to Ms. Anderson a copy of the handwritten note. She responded to the Court stating the State did not oppose modification, but had no specific recommendation.

A hearing was held on D. Jones' Rule 35 motion to modify his sentence on October 7, 2016. Mr. Welsh described a sidebar conference (which was not transcribed) during which the Court expressed frustration and ire with both defense and State's counsel for not having a firm agreement as to what they

12

were asking the Court to do. After the sidebar conference, the Court granted D. Jones' motion, and subsequently entered an order which sentenced him to one year Level 5 pursuant to §4204K (which at that time had already been served), 1 year Level 5, with no "K time" or probation thereafter, and 5 years Level 5, with no "K time", suspended for 4 months Level 4, work release, followed by 3 years Level 3 probation. In short, the order allowed D. Jones to earn"good time" credits on his second year Level 5 sentence, eliminated the third year of Level 5 time for 4 months Level 4 work release, and reduced his Level 3 probationary period from 4 years to 3 years.

At the November 8, 2019 hearing on Q. Jones' Rule 61 motion, I asked Mr. Robinson about the result for D. Jones. I used a common Latin phrase that seems to be overused these days, *quid pro quo*. I asked Mr. Robinson if D. Jones had received the *quo* for his *quid*. He candidly told me D. Jones had received his *quo*.

Where do these facts take us? In my opinion, the State *did* have an agreement to help D. Jones in his desperate effort to seek a reduction of his sentence. I am mindful that the State was careful not to state the agreement in

13

express terms. But D. Jones and his counsel expected help and they got it.[6] The State violated the dictates of *Brady v. Maryland*[7] in plain view. To me the State had only two choices. Either the State made an agreement with D. Jones, disclosed it, and accepted the consequences, or the State made no agreement and opposed any modification of sentence. In the latter option, I have no doubt at all that D. Jones would have served his full sentence.

I find based upon all the evidence that the State had an agreement with D. Jones to help him in his effort to reduce his sentence in exchange for his testimony. I do so for the following reasons:

(1) The timing and the sequence of events, including the repeated failures of D. Jones efforts for reduction before his testimony, coupled with his success after it;

(2) The approach to Mr. Robinson by Mr. Welsh that he rejected prior to Q. Jones' sentencing, and the specific references by Mr. Robinson to waiting until Q. Jones was sentenced;

---

[6]I add this footnote here to express my respect and admiration for the efforts of Mr. Welsh. He did not have to follow D. Jones' case through the hoops and hurdles as it progressed. He could have done nothing and let D. Jones progress down the path he followed. Instead, Mr. Welsh provided advice and service throughout what many would have thought was a task of Sisyphus. I admire Mr. Welsh's conduct as an example to us all as to what zealous representation means.

[7]373 U.S. 83 (1963).

14

(3) The waffling by the State in D. Jones last and successful effort, and ultimate concession by the State to the reduction at D. Jones' hearing on his motion;

(4) Mr. Welsh's persistence in enforcing the "tacit agreement"; and

(5) the State's actions following the testimony, which more than anything else prove an agreement existed before D. Jones testified in Q. Jones' case.

To ignore all of the above and accept the spoken words of "no agreement" would require that I accept fiction.

I am mindful of two similar cases from this Court. In *State v. Andrus*[8] defendant made a claim similar to Q. Jones'. *Andrus* also claimed a "tacit agreement" between the State and the prison informant who helped convict him. In *Andrus,* the Trial Court, after an extensive review of the case history and evidence determined no agreement of any kind existed, and that even if an agreement existed, its disclosure would not have had a substantial impact on *Andrus'* trial. As to the first point, I am of the opinion that the facts here proved an agreement. As to the latter point, Mr. Robinson testified that D. Jones'

---

[8]*State v. Andrus*, 2003 WL 1387115 (Del. Super. Mar. 12, 2003), aff'd, 844 A.2d 991 (Del. 2004) (TABLE).

15

testimony had a substantial impact on Q. Jones' trial. The State also conceded this point in its argument. In *State v. Burton*[9] the Trial Court also concluded that no representations had been made to defense counsel in exchange for a witness' testimony. The witness was the victim of Burton's crimes. In an extended discussion the Court in *Burton* amply supported the reasons for its conclusions.

I have no doubt Mr. Robinson's motives were pure, but his method was flawed. I also have no doubt, and specifically find, that a tacit understanding existed between the State and D. Jones that he would get a substantial benefit for his efforts. Merely saying there was no agreement is not a talisman which innoculates against *Brady* violations. D. Jones' cooperation was bought and, over time, paid for.

In my view, the practice I describe in this opinion has no place in my view in our administration of justice. I do not suggest a proverbial "wink and nod" occurred, but its functional equivalent did.

The State conceded at oral argument that if it had an agreement with D. Jones, it had to be disclosed as *Brady* material. The State also conceded that D. Jones' testimony was significant in the case against Q. Jones and a substantial reason for his conviction. Because I believe the evidence proved that an

---

[9]2015 WL 6735833 (Del. Super. 2015), aff'd, 146 A.3d 64 (Del. 2016) (TABLE).

16

agreement between the State and D. Jones existed in which the State would

materially aid D. Jones in modifying his sentence, a *Brady* violation occurred:

> Under *Brady*..., the State's failure to
> disclose exculpatory and impeachment
> evidence material to the case violates a
> defendant's due process rights.[10]

The United States Supreme Court has written:

> Society wins not only when the guilty
> are convicted but when criminal trials
> are fair; our system of the administration
> of justice suffers when any accused is
> treated unfairly.[11]

*Wright v. State*[12] and *Michael v. State*[13] provide examples in which the

Delaware Supreme Court found *Brady* violations. *Wright* includes the allegation

that a prosecution witness was a prison informant who received an undisclosed

benefit. The State failed to disclose that shortly before Wright's trial the witness

had cooperated with the State in exchange for the State's help in reaching a "better

deal" for himself.

*Michael* involved a *Brady* violation because the prosecution failed to

---

[10]*Starling v. State*, 130 A.3d 316, 332 (Del. 2015).

[11]*Brady v. Maryland*, 373 U.S. 83 (1963).

[12]91 A.3d 972 (Del. 2014).

[13]529 A.2d 752 (Del. 1987).

inform the defense that a charge had been reduced to benefit the victim/witness. The Court wrote in *Michael* that "...whenever the State reduces any pending charges (related or not) or makes any arrangement with any State witness, disclosure is mandatory".[14]

I harken back to the words of President Kennedy: "...the highest appreciation is not to utter words but to live by them." The State here uttered the words of no agreement, but lived by providing the benefit to D. Jones.

I am granting this Rule 61 motion, vacating the conviction of Q. Jones and ordering that a new trial be held.

I do not like the result. It upsets what was done three years ago and eliminates a conviction of serious crimes. I do not like that the victim and her family will again be put through the uncertainty and pain of a second trial. In my view, however, the law and the facts of this case leave me no other choice.

**IT IS SO ORDERED.**

Craig A. Karsnitz

---

[14]*Id.* at 756.